**BRYAN R. WHITTAKER**
Assistant U.S. Attorney
**ERIC E. NELSON**
Special Assistant U.S. Attorney
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone: (406) 457-5120
FAX: (406) 457-5130
E-Mail: Bryan.Whittaker@usdoj.gov
          Nelson.Eric@epa.gov

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, vs. **NOLAN MICHAEL SCHIMPF,** Defendant. | CR 18-13-BU-DLC  **OFFER OF PROOF** |

The United States hereby files its Offer of Proof.

1

## THE CHARGE

The defendant, Nolan Michael Schimpf, is charged in the information with the crime of negligent violation of a pretreatment requirement in violation of 33 U.S.C. § 1391(c)(1).

## PLEA AGREEMENT

Pursuant to a plea agreement, the defendant will plead guilty to the information. The government agrees not to pursue any other charges against the defendant.

The plea agreement entered into by the parties and filed with the Court represents, in the government's view, the most favorable offer extended to the defendant. *See Missouri v. Frye*, 566 U.S. 134 (2012).

## ELEMENTS

In order for the defendant to be found guilty of negligent violation of a pretreatment requirement in violation of 33 U.S.C. § 1391(c)(1), as charged in the information, the United States must prove each of the following elements beyond a reasonable doubt:

First, a person negligently;

Second, violated a pretreatment requirement, that is, discharged wastewater into any natural outlet within the City of Bozeman or to the City's publicly owned treatment works;

Third, that such person did so without authorization by the City of Bozeman.

## PENALTY

This offense carries a maximum punishment of one year imprisonment, a fine of not less than $2,500 nor more than $25,000 per day of violation, one year of supervised release, and a $25 special assessment.

## ANTICIPATED EVIDENCE

If this case were tried in United States District Court, the United States would prove the following:

### BACKGROUND

1. USA Brass Company, Inc. ("USAB") was incorporated in the state of Texas on March 5, 2013. Its business facility was located at 25 Evergreen Drive, Bozeman, Montana 59715. NOLAN MICHAEL SCHIMPF ("SCHIMPF"), was USAB's chief production officer.

2. USAB employed about 20 employees. SCHIMPF and Zachary Flanagan were in charge of day-to-day operations and were present at the facility on a regular basis. USAB was in the business of cleaning and polishing spent ammunition casings for resale and reuse. USAB brought in "fired brass" from military bases, shooting ranges, and recycling centers. The brass (spent ammunition casings) was sorted by individual caliber, and then cleaned and

polished.   The cleaning (also referred to as wet washing) was accomplished by depositing the brass into cement mixers where a water and vinegar solution was added to clean the brass.   Once the brass was clean, the wastewater was drained from the cement mixers.   The wastewater was collected in blue totes, which held approximately 300 gallons each.

      3.      During the cleaning process, the wastewater became contaminated with lead, a toxic metal.   The cleaning process caused lead to be in the wastewater at high enough levels to be considered a pollutant under the Clean Water Act.

## CLEAN WATER ACT

      4.      The Federal Water Pollution Control Act (commonly referred to as the "Clean Water Act"), Title 33, United States Code, Section 1251, *et seq.*, was intended to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.   Among other things, the Clean Water Act required the EPA to establish standards for the introduction of pollutants generated by industrial (non-domestic) users, such as USAB, to publicly owned treatment works, in order to prevent pollutants from passing through, or interfering with the operation of, such treatment works.   Title 33 United States Code, Section 1317(b).   The term "pretreatment" referred to the reduction, elimination or alteration of the nature of pollutant properties of wastewater prior to the discharge of such wastewater to

publicly owned treatment works.   Title 40, Code of Federal Regulations, Section 403.3(s).

5.   The Clean Water Act further required municipalities and regional authorities operating publicly owned treatment works that accept wastewaters containing pollutants from industrial users to adopt a program to assure compliance with pretreatment standards and requirements consistent with federal regulations. Title 33, United States Code, Sections 1342(a)(3) and (b)(8).   Title 33 United States Code, Section 1319(c)(2)(A) of the Clean Water Act prohibits industrial users from operating a source of pollutants in violation of any effluent standard or prohibition, pretreatment standard or requirement imposed by a pretreatment program approved by either the EPA or an authorized state pursuant to Title 33, United States Code, Section 1342(a)(2) or 1343(b)(8).

6.   The City of Bozeman owned and operated a publicly owned treatment works ("POTW").   The City promulgated a pretreatment program consisting of standards and requirements governing discharges of wastewater into the treatment works.   A City ordinance establishing the pretreatment program was approved by the EPA on or about October 18, 1985, and is codified in the Bozeman Code of Ordinances, Part II, Chapter 40, Article 3, Division 3.   Thus, the Bozeman POTW was within the jurisdiction of the EPA.

7.     The standards and requirements comprising the approved City of Bozeman pretreatment program, among other things, prohibited any industrial user from discharging wastewater to any natural outlet within the City or to the publicly owned treatment works except as authorized by the City.   Bozeman Code of Ordinances, Section 40.03.940.

## NEGLIGENT DISCHARGE

8.     Beginning in September 2013, USAB installed a sink in the facility for the purpose of discharging lead wastewater into city sewer system.   USAB employees reported that the blue totes containing the lead wastewater were moved to the sink on a forklift and the wastewater was pumped into the sink until they were empty.   The totes were full and there was no effort to gauge or regulate the flow.   A filtration system was used for a few days but was abandoned because it quickly became clogged.   Flanagan and Schimpf were observed to be present on more than one occasion while wastewater was being pumped down the sink. Neither Flanagan nor Schimpf stopped the discharge.   Likewise, neither Flanagan nor Schimpf had notified, or sought permission from, the POTW to discharge the wastewater into the sewer system.

9.     In November 2013, Flanagan contacted by email Dustin Johnson, pretreatment coordinator of the Bozeman POTW.   Flanagan's purpose in

contacting the POTW was to attempt to gain permission for USAB to discharge lead wastewater into the city sewer system.

    10.    Johnson informed Flanagan that USAB would have to have the wastewater analyzed and submit the test results. On November 25, 2013, Flanagan emailed Johnson and submitted a waste water survey.

    11.    Flanagan also attached testing results from Energy Laboratories, Inc. that showed lead results as 6.94 milligrams per liter (mg/L). The survey contained the following statements:

    a.    The vinegar/water wastewater was filtered in a 5 stage process.

    b.    The average gallons per day of waste generated by the facility was listed as 10-25 gallons.

    c.    Screens used are to filter out any contaminants that are pushed through our filtration system.

    d.    Liquid wastes are not disposed of by any means other than discharge to the sewer system.

    e.    We currently recycle this solution through a series of filters which are very costly.

    f.    Now that we have received test results from Energy Laboratories and Scott Rogers from Environmental Solutions has analyzed the

>    results; we wish to dispose of the material through the sewer given the fact it meets all city standards.

12. Flanagan's statements to Johnson were false. First, the average amount of wastewater generated by USAB per day was much higher than 10-25 gallons. Second, USAB was not using a filtration system. Third, the wastewater was already being discharged into the POTW by USAB. And, prior to the discharges into the sink, USAB had been disposing of its lead wastewater by dumping it on the ground outside USAB's facility.

13. On December 4, 2013, Flanagan again emailed Johnson and stated that he was touching base regarding the "sample test results and application you requested we sent over 3 weeks ago." Flanagan further stated:

>    As we ramp up in our production schedule we will generate some waste water we wish to dispose of through the sewer. Our lab results were analyzed by Scott Rogers and he said the waste water would be fine to send down the Sewer. However I wanted to get your approval before we do so.

14. Flanagan's above statement and representation to the Bozeman POTW administrator was false, because, the environmental consultant Scott Rogers had not reviewed the lab results of the wastewater and had not concluded that the wastewater "would be fine" for discharge to the POTW.

15. On the same day, approximately an hour later, Johnson responded to Flanagan's email. Based upon Flanagan's false representations, Johnson granted USAB authorization on a limited basis, and on certain restricted conditions, to discharge 10-25 gallons per day of lead wastewater into the POTW.[1] Johnson further required that the discharge could occur at no greater than 5 gallons per hour. He also required that the wastewater be diluted with clean water.

16. Despite the limited authorization, after December 4, 2013, USAB continued to discharge lead wastewater down the sink far in excess of the permitted amounts. Some employees reported that USAB discharged up to 300 gallons per day into the POTW. USAB also did not filter the water and did not regulate the flow rate of the discharge.

17. Because USAB did not comply with the conditions set by the POTW as of December 4, 2013, the discharges between that date and approximately March 26, 2014, were not authorized by the POTW. Schimpf knew that USAB was discharging more than 25 gallons per day of unfiltered lead-contaminated wastewater to the POTW. He was present during some the discharges and as the

---

[1] When Johnson later learned that Flanagan had provided false information to him, he stated he never would have granted authorization to USAB to discharge the lead wastewater into the POTW had Flanagan provided him with the truthful information.

chief production officer, did nothing to stop the unauthorized discharges. He therefore negligently caused the wastewater to be discharged to the POTW without authorization.

DATED this 8th day of August, 2018.

                                      KURT G. ALME
                                      United States Attorney

                                      /s/ *Bryan R. Whittaker*
                                      Assistant United States Attorney
                                      Attorney for Plaintiff